```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                    :   Case No. 24-cv-5595
ROSETTA JAISINGH,                                                   :
                                    Claimant,                       :
                                                                    :
                                                                    :                COMPLAINT
            – against –                                             :                    AND
                                                                    :              JURY DEMAND
SYNCHRONY BANK,                                                     :
                                                                    :
                                    Respondent.                     :
                                                                    :
------------------------------------------------------------------- X
```

## PRELIMINARY STATEMENT

1. Rosetta Jaisingh brings this claim against Synchrony Bank (Synchrony) for violation of the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* (TILA) and New York General Business Law § 349, and for common law fraud.

2. Ms. Jaisingh visited a local dentist's office to obtain needed dental work after she suffered a broken tooth. The dentist's office, acting as Synchrony's agent, coerced Ms. Jaisingh into agreeing to pay for a crown by telling her that she could pay it in installments over two years and assuring her she would accrue no interest. They had Ms. Jaisingh sign a credit application that repeated this representation, but provided her with no formal contract or any documents or disclosures to the contrary, in violation of TILA.

3. Soon afterwards, Ms. Jaisingh was shocked to receive in the mail an Installment Loan Contract that she had never seen or signed. This Contract listed Synchrony Bank as the Lender and purported to obligate Ms. Jaisingh to pay for the procedure—$4500—financed at an interest rate of 29.99%, for a total amount due of $6,876.36, thousands more than the deferred interest arrangement she was promised and applied for.

1

4. Had Synchrony and its agent provided Ms. Jaisingh with the required disclosures, or told her the truth about the transaction they intended to bind her to, she would never have agreed to finance the dental work. As a result of Synchrony's and its agent's actions, Ms. Jaisingh suffered damages, for which she now seeks relief.

## PARTIES

5. Rosetta Jaisingh is a natural person who resides in Queens County, New York.

6. Synchrony Bank is a national banking association headquartered in Utah that regularly does business in New York, including by extending credit and financing to New York consumers at retail locations in New York.

7. On August 10, 2023, Ms. Jaisingh visited Lincoln Family Dental, a dental office located in Queens, New York, for dental work. Lincoln Family Dental served as Synchrony's agent in extending Ms. Jaisingh financing for that dental work.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq. 15 U.S.C. § 1640(e) provides that civil actions brought under the TILA may be commenced in any United States District Court without regard to the amount in controversy.

9. This Court has supplemental jurisdiction over Ms. Jaisingh's New York state law claims based on fraud and New York State General Business Law § 349 because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *See* 28 U.S.C. § 1367(a).

10. Synchrony Bank does business in the Eastern District of New York by issuing credit and financing at retail locations in the Eastern District of New York, sues and is sued in

2

the Eastern District of New York, and, accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391(c).

11. Venue in this District is also proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Queens County.

## STATEMENT OF FACTS

12. Ms. Jaisingh is 51-year-old Queens resident who moved to the United States from Guyana in April 2023. She works as a home health aide, and lives with her husband, a mechanic, and her adult daughter, who is currently unable to work following an injury on the job.

13. A few months after she moved here, Ms. Jaisingh's tooth broke. She knew it needed to be examined and visited Lincoln Family Dental for care ("Lincoln"). The staff took her identification and insurance information, then led her to an examination room.

14. A dentist soon came into the examination room and without asking her consent or providing her with any pain medication, began drilling into her tooth. The drilling caused Ms. Jaisingh pain even though the tooth had not hurt when she originally arrived at the office.

15. After a few minutes, the dentist paused and said the only option would be to install a crown on the broken tooth. This service would cost $4,500 but, he explained, Ms. Jaisingh could pay for the treatment on a payment plan—$191 per month for two years—without incurring interest.

16. Ms. Jaisingh asked the dentist and his staff six or seven times for verbal confirmation of these terms, asking whether they were certain that if she financed the service, she would incur no interest for two years. Each time, the dentist and his staff assured her there would be no interest.

3

17. Because she felt she could just barely afford $4500 spread over two years, she decided to agree to get the crown from Lincoln and to pay for the work under the terms Lincoln had proposed.

18. Had the plan involved the accrual of interest, or an overall amount owed that exceeded $4500, Ms. Jaisingh would not have agreed to proceed.

19. While she was sitting in the chair, Lincoln's staff gave her two papers to sign in hard copy.

20. One document was entitled "Treatment Financing Plan." It listed the Treatment Fee as "$4500" and a total payment amount of "$4500. **Exhibit A**.

21. Underneath was a section subtitled "WHAT ARE YOU AGREEING TO?" and a list of terms and statements for the signer to agree to, which included multiple references to no-interest financing and no references to interest-bearing plans. Some of the statements were:

   a. "I understand that for Care Credit it involves the sign up of a special credit card that can be used for my dental expenses. Care Credit often offers promotions that allow me to pay for my care over 24 months without any interest charges. Approval through Care Credit requires a hard credit inquiry, which may have a temporary impact on my credit score."

   b. "I understand that Care Credit offers financing plans with no interest for up to 24 months. If I require longer-term financing, options are available for up to 60 months, but there will be interest charges applied based on my credit score and loan amount."

   c. "I understand that once I am approved, I will need to sign the loan terms. It will be my responsibility to set up a repayment plan with the finance company

        and provide my bank account information. Lending Point requires bank or debit card information up front."

    d. "I understand that no-interest financing is deferred. This means that if I miss a repayment, I will be charged full interest on the entire loan. It is my responsibility to pay to avoid any unexpected charges."

22. These statements confirmed in Ms. Jaisingh's mind that the credit she was applying for would carry the terms that Lincoln's staff had laid out: no interest, and monthly payments of $191 for two years.

23. Ms. Jaisingh checked the box indicating she agreed with the document and signed it by hand. Two other individuals signed the document, purportedly the "office manager," Kiomara A, and the dentist, Ross Teicher.

24. The other document was entitled "Third Party Financing Application Authorization." **Exhibit B.** This document authorized Lincoln Family Dental "to facilitate the submission of [her] application for credit via…Care Credit (Allegro)." The representation and agreement that Ms. Jaisingh was applying for credit only with Care Credit, combined with the representations in the Treatment Financing Plan that Care Credit plans carried deferred interest convinced Ms. Jaisingh that she would only be charged no or deferred interest on the procedure. Ms. Jaisingh signed this document too.

25. Neither the "Treatment Financing Plan" nor the "Third Party Financing Application Authorization" gave permission for any other person to execute or enter into a contract on Ms. Jaisingh's behalf. *See* **Exs. A, B**.

26. Ms. Jaisingh received copies of these documents to take home with her. But she was not presented with a final contract, terms, disclosures, or any other documents to sign, nor

5

was she presented with anything to sign electronically. She was not presented with a computer screen, tablet, phone screen, or signature pad. The staff simply took the two pages she had signed and left the room.

27. The dentist then proceeded to install the crown on Ms. Jaisingh's broken tooth and Ms. Jaisingh went home.

28. Soon afterwards, Ms. Jaisingh was shocked to receive in the mail a single page document entitled "Installment Loan Contract" (ILC) that—rather than the describing the no- or deferred-interest financing plan she thought she had agreed to—charged her 29.99% simple interest, resulting in a finance charge of $2,376.36 and a total payment amount of $6,876.36. This amount was to be paid in installments of $191 over the course of 36 months, rather than the 24 months Ms. Jaisingh had expected. The document lists Synchrony Bank as the "lender" but does not mention Lincoln Family Dental or describe the services that were financed, instead falsely stating that the loan was to finance "goods." (ILC, pp. 1, 2). **Exhibit C.**

29. Ms. Jaisingh also received a bill in the mail that read "Synchrony Allegro Credit" across the top along with a customer service number.

30. Worried about the interest rate on the ILC, which she could not afford, Ms. Jaisingh called the customer service number on her bill, and the Synchrony representative told her that they could not do anything for her. The only possibility, the representative said, would be for Ms. Jaisingh to cancel the transaction with Lincoln Dental and for Lincoln Dental to pay back Synchrony. Ms. Jaisingh called Lincoln Dental to propose this, but they would not agree.

31. Ms. Jaisingh told Synchrony that she had not agreed to pay interest on the financing. Synchrony asked her to send them the documents she had signed. She sent the documents attached as Exhibits A and B but never received a response.

32. Worried her efforts to resolve the situation would go unheard by Synchrony, Ms. Jaisingh began making payments on the ILC to the address listed on the bill.

33. Over the next several months, Ms. Jaisingh called Synchrony repeatedly to explain that she had never agreed to pay interest. She was told again to send over her documents and she did so, but still never received a response.

34. Ms. Jaisingh also contacted Lincoln multiple times to obtain a complete copy of the contract and to let Lincoln know that she had not agreed to the terms in the ILC. Lincoln's staff kept telling her they would send her the documents but never did.

35. On one occasion, a staff member whose name Ms. Jaisingh believes is Illiana sneered at Ms. Jaisingh, asking her whether she was "dumb" and "stupid." This staff member also told Ms. Jaisingh that by signing the two documents she had signed—the Treatment Financing Plan and the "Third Party Financing Application Authorization"—she had given permission for the ILC to be executed on her behalf. This, of course, was false.

36. Finally, at the end of May 2024, Lincoln emailed Ms. Jaisingh a 13-page packet that included the entirety of the ILC and some other documents. Ms. Jaisingh does not have a computer or printer and wears glasses, and could not properly see the documents on her phone. She visited an office supply store and printed out the package at 50 cents per page so that she could read the terms.

37. The package Lincoln sent her appears to be a single Docusign envelope[1] and most pages bear the same DocuSign Envelope ID at the top left.

---

[1] A Docusign "envelope" is "an electronic container used to send documents for signature via Docusign eSignature." *See* Docusign, What Is a Docusign Envelope?, https://www.docusign.com/blog/what-docusign-envelope (last visited Aug. 7, 2024).

38. The first document in the package is a 5-page ILC, purporting to charge 29.99% interest on $4,500 financed, for a total amount owed of $6,876.36. The second page describes the "financing plan" as "standard," and the ILC bears the purported electronic signature of Ms. Jaisingh, dated 8/10/2023.

39. The ILC does not mention Lincoln Family Dental anywhere (though it refers generically to the "Seller" in paragraph 2) and does not describe the nature of the services financed. Instead, it falsely claims twice that the ILC concerned a purchase of "Goods." **Ex. C, ¶¶ 1, 5.**

40. The ILC also contains a notice providing that "any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained with the proceeds hereof." **Ex. C, at p. 5.**

41. The second document in the PDF is entitled "Consumer Credit Application." The first section, "Applicant Information," lists Ms. Jaisingh's correct name and contact information. But it states the wrong birth year and falsely represents her income as $72,000.00. Lincoln did not ask Ms. Jaisingh her income, and if they had she would have been honest that she earns only about $29,000 per year. She would not have overstated her income because she did not want to be extended credit with interest or that she could not afford.

42. Below that information is a section entitled "Applicant Initials," but instead of being initialed, the box simply says "NA," which on information and belief stands for "not applicable."

43. The next page, "Application Disclosures," purports to bear the electronic signature of Ms. Jaisingh, but she was never shown this document and never electronically signed it.

8

44. On the next two pages is a "Synchrony Bank Privacy Policy," which Ms. Jaisingh did not see or sign.

45. Page 10 of the PDF is an electronically generated "Certificate of Completion," stating that the DocuSign "Envelope"[2] package regarding Ms. Jaisingh was "completed" with 2 signatures and 0 initials.

46. But Ms. Jaisingh was never shown any of the documents in the packet and she did not electronically sign any of them.

47. The Certificate of Completion states that the envelope's status was "Original" at 3:10:30 PM, "Sent" at 3:10:32 PM, "Viewed" at 3:10:43 PM, and "Signed" at 3:10:50 PM.

48. These timestamps indicate that the ILC and related documents were generated in their original form at 3:10:30 PM, sent two seconds later, viewed 11 seconds after that, and signed 7 seconds after that. That is, according to Lincoln and Synchrony's own documents, the documents were signed a mere 7 seconds after they were viewed, and the entire process—from generation to completion—took only 20 seconds total.

49. This timeline is impossible on its face. No person could have reviewed the pages of the ILC and signed them in only 7 seconds.

50. Instead, Lincoln, acting as agent for Synchrony, electronically signed the package. They never gave, or even showed, any of the disclosure documents to Ms. Jaisingh.

51. At the bottom of the Certificate of Completion is a field entitled "Electronic Record and Signature disclosure" which, unlike the other fields on the page, does not list a status or timestamp.

---

[2] A Docusign "envelope" is "an electronic container used to send documents for signature via Docusign eSignature." *See* Docusign, What Is a Docusign Envelope?, https://www.docusign.com/blog/what-docusign-envelope (last visited Aug. 7, 2024).

52. The last three pages of the PDF are an "Electronic Record and Signature Disclosure." This document does not bear a Docusign Envelope ID and does not contain a hard copy, electronic signature, or timestamp. At the top right, however, is text reading "Parties agreed to: rosetta jaisingh."

53. Ms. Jaisingh did not see this document or sign it in hard copy or electronically. She did not consent to electronic signatures for the transaction through this form or any other method.

54. Because neither Lincoln Family Dental nor Synchrony Bank would release Ms. Jaisingh from the account, Ms. Jaisingh has been making monthly payments and continues to receive bills for this account.

55. In July 2024, Ms. Jaisingh began calling nonprofit legal services organizations for advice because she could not afford the interest being charged by Synchrony and was worried about being obligated to pay it. She was able to make an appointment with CAMBA Legal Services, Inc., a nonprofit in Flatbush, Brooklyn, and traveled there by car from her home in Queens, so she had to pay for gas.

56. On information and belief, throughout the time period described here, Lincoln Family Dental was acting as agent for Synchrony Bank in the solicitation, application, approval, and consummation of credit transactions, including the transaction with Ms. Jaisingh. Lincoln was acting in the scope of its agency authority, and Synchrony had the right to control Lincoln and knowledge of Lincoln's actions, and benefited from those actions.

57. As a direct result of the actions of Synchrony and its agent, Lincoln Family Dental, Ms. Jaisingh has suffered significant harm.

58. She is obligated to Synchrony for thousands of dollars more than she can afford and than she intended and agreed to pay.

59. She spent money on printing out documents to understand what had happened and spent money seeking legal advice about her obligation under the ILC.

60. She has had to spend hours on the phone with Synchrony and Lincoln Family Dental and sending and re-sending them documents.

61. She worries constantly about whether she will be responsible for the 29.99% interest, which she can't afford. She has lost sleep thinking about this and is constantly distracted.

62. In October 2023, shortly after she received the ILC and her first bill from Synchrony, Ms. Jaisingh began suffering from severe headaches, which she describes as a pounding around her eyes and the back of her neck. These headaches worsen her already fractured sleep and make it hard for her to concentrate at work. She has had to seek medical attention for these headaches, but all tests have come up negative and she continues to suffer from ongoing pain.

63. Ms. Jaisingh's already high blood pressure has spiked, causing her to feel faint and like her heart is racing. She often has to increase her daily dose of blood pressure medication from one tablet to two tablets.

64. Normally Ms. Jaisingh is a calm and quiet person, but the stress and anxiety of this situation have changed her. Her husband has told her she is on edge and is frustrated with her. Her adult daughters worry about her and tell her she is distracted. One daughter once began crying when Ms. Jaisingh told her about her awful headaches.

65. Even Ms. Jaisingh's young granddaughter can sense the change in her: when Ms. Jaisingh tries to play with her, her mind is elsewhere and her granddaughter has begun gravitating to her grandfather instead.

## FIRST CLAIM FOR RELIEF
(Truth in Lending Act, 15 U.S.C. §§ 1601 et seq.)

66. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

67. Synchrony Bank regularly extended, extends, or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments. In particular, it extended credit to Ms. Jaisingh for which it unilaterally imposed a finance charge. This was not an open end credit plan.

68. Synchrony Bank is a creditor within the meaning of the TILA, 15 U.S.C. § 1602(f) and the relevant implementing regulations.

69. At all times described herein, Lincoln Family Bank served as Synchrony Bank's agent and was acting in the scope of its agency.

70. The transaction between Synchrony Bank and Ms. Jaisingh concerned the installation of a dental crown in Ms. Jaisingh's mouth and as such was a transaction for personal, family, and household purposes. Therefore, it was a consumer credit transaction within the meaning of the TILA, 15 U.S.C. § 1602 and its implementing regulations.

71. Before the purported consummation of the ILC, Ms. Jaisingh was not provided with any TILA disclosures in any form, in violation of 15 U.S.C. § 1638(a), 1638(b).

72. Ms. Jaisingh was not provided disclosures conforming with the requirements of TILA and its implementing regulations: the cost of credit, including the true cash price, APR, amount financed, finance charge and monthly payment were not timely, accurately and clearly

and conspicuously disclosed to her, a consumer within the meaning of the TILA, in violation of § 1638(a),(b).

73. Synchrony's failure to provide accurate TILA disclosures to Ms. Jaisingh caused her to believe that if she financed the crown procedure, she would be able to pay back the loan through monthly payments of $191 for two years, without accruing interest. She specifically asked multiple times whether the loan would carry interest, and was clearly told it would not. Based on these representations, and the absence of documents to the contrary, Ms. Jaisingh agreed to proceed with the transaction.

74. Had the ILC disclosures been provided to her before she agreed, she would not have proceeded with the transaction and the harms she suffered would not have occurred.

75. As a result of these TILA violations Ms. Jaisingh has suffered harm in the form of monetary harm, time expended, and emotional distress. She is entitled to actual damages, statutory damages, costs, and attorney's fees.

## SECOND CLAIM FOR RELIEF
(New York General Business Law § 349)

76. Ms. Jaisingh repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

77. Defendant violated § 349 of the New York General Business Law by using deceptive acts and practices in the conduct of its business, including but not limited to its agent representing to Ms. Jaisingh that the financing would have no interest when in fact Defendant unilaterally consummated an ILC that charged 29.99% interest; and claiming that Ms. Jaisingh had given permission to enter into an ILC on her behalf when she signed the Treatment Financing Plan and the Third Party Financing Application Authorization, which is false.

13

78. Synchrony is liable for Lincoln's conduct as the holder of the ILC, pursuant to the ILC itself and the FTC Holder Rule, 16 C.F.R. § 433.2.

79. Synchrony is also liable for Lincoln's conduct because Lincoln was acting at all times as its agent in soliciting and issuing credit, and because Synchrony knew about, participated in, and benefited from Lincoln's misconduct, which was foreseeable by Synchrony. In addition, Synchrony, on its own and/or through Lincoln, prepared, provided, and/or accepted the Treatment Financing Plan and Third Party Financing Application Authorization that Ms. Jaisingh signed, which made it appear she was applying for one type of credit (a deferred interest plan), but then issued another type (29.99% APR plan). Synchrony also knew or should have known, through the Docusign timestamps, that Ms. Jaisingh could not have been provided with the disclosures or the ILC and could not have signed the ILC.

80. The "Treatment Financing Plan" and the "Third Party Financing Application Authorization" are deceptive because they represent to consumers that they are applying for one credit instrument while Synchrony actually issues a higher cost credit instrument. Because these are forms Synchrony uses them across transactions and makes these misrepresentations to broadly to consumers.

81. Defendant's conduct is directed towards and has a broad impact on consumers at large.

82. Defendant's agent Lincoln Family Dental also has a pattern and practice of entering into installment contracts issued by Synchrony on behalf of consumers without their knowledge or permission,

83. Specifically, there are multiple online reviews of Lincoln Family Dental in which other consumers complain of similar deceptive conduct.

84. In one Google review, posted 4 months ago, "Sandy Ramnarine" explained that "they will charge you, apply for CareCredit on your behalf, which is what happen to my mom. My CareCredit was once charged by them just using my ssn, no ID needed to verify who you are."

85. CareCredit is a product of Synchrony Bank.

86. A screenshot of this review is attached as **Exhibit E** and can be accessed at https://g.co/kgs/qPEjni2.

87. In another Google review, posted 6 months ago, "Jinda Blanks" reported that her 66-year-old father visited Lincoln Family Dental for a cleaning: "Next thing you know he was missing four teeth that they just just extracted without full permission from him. They made him sign some forms telling him that that's the only way he can be seen next thing you know he had a paper saying he owes $11,000 be careful."

88. A screenshot of this review is attached as **Exhibit F** and can be accessed at https://g.co/kgs/nuJZioq.

89. On Facebook, "Ashley Hobbs" wrote on January 9, 2024 that her father went in for a routine exam and that Lincoln "scared him into an emergency surgery where they extracted four teeth and charged him $11K in cash, which he did not have, so while under local anethesia, they had him take out a LOAN through them to pay them $11K."

90. A screenshot of this review is attached as **Exhibit G** and can be accessed at https://www.facebook.com/OfficialLincolnFamilyDental/reviews.

15

91. Defendant's actions are intentional and have the purpose of causing consumers to become obligated on high-interest installment loans they would not otherwise enter into.

92. As a direct and proximate result of Defendant's violations of N.Y. Gen. Bus. Law § 349, Ms. Jaisingh has sustained actual damages, including emotional distress, plus such other damages as may be determined by the Court. Ms. Jaisingh is also entitled to receive treble damages, injunctive relief, attorneys' fees and costs. N.Y. Gen. Bus. Law § 349(h).

### THIRD CLAIM FOR RELIEF
(Fraud)

93. Ms. Jaisingh repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

94. Synchrony is responsible for the conduct of Lincoln Family Dental because Lincoln was acting at all times as its agent in soliciting and issuing credit, and because Synchrony knew about, participated in, and benefited from Lincoln's misconduct, which was foreseeable by Synchrony.

95. Synchrony is also liable for Lincoln's conduct as the holder of the ILC, pursuant to the ILC itself and the FTC Holder Rule, 16 C.F.R. § 433.2.

96. Defendant defrauded Ms. Jaisingh by affirmatively misrepresenting to Ms. Jaisingh that the financing for her dental procedure would carry no interest, so that she could pay back the $4500 treatment fee over the course of two years in monthly installments of $191.

97. In justifiable reliance on these representations, Ms. Jaisingh agreed to the procedure and financing, and signed two documents permitting Synchrony Bank to run her credit.

98. In fact, however, Synchrony Bank and its agent Lincoln Family Dental, prepared and electronically signed an Installment Loan Contract for financing at a cost of 29.99%, with an additional finance charge of $2,376.36.

99. Defendant's representations and conduct were materially false. Defendant knew they were false and made them with the purpose of inducing Ms. Jaisingh to rely upon them and proceed with the transaction.

100. Had Synchrony Bank and Lincoln Family Dental been truthful about the contents of the ILC and not made fraudulent misrepresentations, Ms. Jaisingh would not have agreed to the dental procedure, the financing, or the application for credit.

101. Ms. Jaisingh was injured by this fraud and is therefore entitled to actual damages, punitive damages, and costs.

## FOURTH CLAIM FOR RELIEF
(New York Retail Installment Sales Act, N.Y. Pers. Prop. §§ 401 et seq.)

102. The ILC is a retail instalment obligation within the meaning of the New York Retail Instalment Sales Act in that it was an agreement by Ms. Jaisingh, solicited in person within the state, to pay the time sale price, or a price thereof, of the installation of her crown, a personal service. N.Y. Pers. Prop. § 401(7).

103. Synchrony is responsible for the conduct of Lincoln Family Dental because Lincoln was acting at all times as its agent in soliciting and issuing credit, and because Synchrony knew about, participated in, and benefited from Lincoln's misconduct, which was foreseeable by Synchrony. Synchrony is also liable for Lincoln's conduct as the holder of the ILC, pursuant to the ILC itself and the FTC Holder Rule, 16 C.F.R. § 433.2.

104. NYRISA requires a retail instalment obligation to be in writing. *Id.* at § 402(1). Defendant did not provide Ms. Jaisingh with a writing at the time of the original transaction.

17

105. NYRISA requires a retail instalment obligation to list the names of the seller and the buyer, the place of business of the seller, the residence of the buyer, and an adequate description of the subject goods or services. § 402(3)(a). The ILC only lists Synchrony Bank as the lender; though it specifies that "the Loan is made to finance the purchase of certain goods" and references a "seller"—making clear that this was a retail instalment obligation—it does not identify Lincoln Family Dental as the seller and states, without specifying, that the subject of the contract is "goods," rather than the specific service of installing a new crown.

106. NYRISA requires the disclosure in an obligation of all items required under TILA. *Id.* § 402(3)(1). As set forth above, Defendant failed to provide Ms. Jaisingh with any required TILA disclosures before the transaction was consummated.

107. NYRISA requires an executed copy of a retail instalment obligation to be delivered or mailed to the buyer; until it is so delivered, a buyer has the unconditional right to cancel the obligation and to receive a refund of all payments. *Id.* § 405. Defendant failed to provide Ms. Jaisingh with a purportedly executed copy of the obligation until late May 2024, over 8 months after the transaction at issue here, but refused her attempts to cancel.

108. Defendant's violations were willful and Defendant has refused to remedy its violations despite multiple attempts by Ms. Jaisingh.

109. As a result of Defendant's violations, Ms. Jaisingh is entitled to recover an amount equal to the credit service charge imposed and the amount of any delinquency, collection, extension, deferral or refinance charges imposed. *Id.* § 407(2)

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that his Court:

1. Enter judgment for Plaintiff on all causes of action;

2. Enter an injunction requiring Defendant to comply with the Truth in Lending Act and to train its employees and vendors accordingly;

3. Award actual, statutory, and punitive damages to the Plaintiff;

4. Award reasonable attorneys' fees and costs to the Plaintiff, and

5. Award such other and further relief as may be just, equitable, and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury.

Dated: Brooklyn, New York
August 9, 2024

Respectfully submitted,

By: *Divya Subrahmanyam*
CAMBA LEGAL SERVICES, INC.
Divya Subrahmanyam, Of Counsel
Matthew Schedler, Of Counsel
Elizabeth Miller, General Counsel
20 Snyder Ave.
Brooklyn, NY 11226
Phone: (718) 940-6311
DivyaS@camba.org
*Attorneys for Plaintiff*